Vermilion Parish
Filed Oct 05, 2026 8:30 AM
Kaylen Broussard
Deputy Clerk of Court
E-File Received Oct 01, 2026 5:43 PM
C-118072
I1

**15th JUDICIAL DISTRICT COURT FOR THE PARISH OF VERMILION**

**STATE OF LOUISIANA**

**NO.** **DIVISION " "**

**SAMANTHA HUDNALL GUIDRY, ET AL.**

**VERSUS**

**GOM SHELF LLC, ET AL.**

---

**PETITION FOR DAMAGES**

---

NOW INTO COURT, through undersigned counsel, come Plaintiffs identified below, who respectfully represent as follows:

1.

Plaintiff **Samantha Hudnall Guidry** is a person of the full age of majority domiciled in Vermilion Parish, Louisiana. She brings this action individually and on behalf of her minor child, Plaintiff **Jaxton Guidry**, under La. C.C.P. art. 683.

2.

Plaintiff **Josiah Guidry** is a person of the full age of majority domiciled in Vermilion Parish, Louisiana.

3.

Plaintiff **Jaylah Guidry** is a person of the full age of majority domiciled in Vermilion Parish, Louisiana.

4.

Plaintiff **Kyle Hudnall** is a person of the full age of majority domiciled in Catahoula Parish, Louisiana.

5.

Plaintiff **Lyle Hudnall** is a person of the full age of majority domiciled in Catahoula Parish, Louisiana.



NON-CERTIFIED COPY

EXHIBIT A-1

6.

Plaintiff **Matthew Bowen** is a person of the full age of majority domiciled in Vermilion Parish, Louisiana.

7.

Plaintiff Jana **Toups Bowen** is a person of the full age of majority domiciled in Vermilion Parish, Louisiana. She brings this action individually and on behalf of her minor child, Plaintiff **Thomas Bowen**, under La. C.C.P. art. 683.

8.

Plaintiff **Andrew Darrel Mann** is a person of the full age of majority domiciled in Vermilion Parish, Louisiana.

9.

Plaintiff **Jardin Mann** is a person of the full age of majority domiciled in Vermilion Parish, Louisiana. She brings this action individually and on behalf of her minor children, Plaintiffs **Beaux Mann**, **Greyson Mann**, and **Scarlett Mann**, under La. C.C.P. art. 683.

10.

Plaintiff **Nichalos David Fish** is a person of the full age of majority domiciled in Vermilion Parish, Louisiana.

11.

Plaintiff **Torie Lynn Fish** is a person of the full age of majority domiciled in Vermilion Parish, Louisiana.

12.

Plaintiff **Ahlia Ray Trahan** is a person of the full age of majority domiciled in Vermilion Parish, Louisiana.

13.

Plaintiff **Janis Belaire** is a person of the full age of majority domiciled in Vermilion Parish, Louisiana. She brings this action individually and as the surviving spouse of **Allen Dale Belaire**.



NON-CERTIFIED COPY

14.

Plaintiff **Jennifer Comeaux** is a person of the full age of majority domiciled in Vermilion Parish, Louisiana. She brings this action individually and on behalf of her minor children, Plaintiffs **Kiptyn Comeaux** and **Bentley Comeaux**, under La. C.C.P. art. 683.

15.

Plaintiff **Corbet J. Domingues, Jr.,** is a person of the full age of majority domiciled in Vermilion Parish, Louisiana.

16.

Plaintiff **Charlotte Domingues** is a person of the full age of majority domiciled in Vermilion Parish, Louisiana.

17.

Plaintiff **Anastasie P. Domingues** is a person of the full age of majority domiciled in Vermilion Parish, Louisiana.

18.

Plaintiff **Jonathan Norris** is a person of the full age of majority domiciled in Vermilion Parish, Louisiana.

19.

Plaintiff **Jennifer Domingues Norris** is a person of the full age of majority domiciled in Vermilion Parish, Louisiana. She brings this action individually and on behalf of her minor child, Plaintiff **Chase Norris**, under La. C.C.P. art. 683.

20.

Plaintiff **Joyce K. Lane** is a person of the full age of majority domiciled in Vermilion Parish, Louisiana.

21.

The following parties are made Defendants in this lawsuit and are liable to Petitioners for damages, together with legal interest from the date of judicial demand until paid:



NON-CERTIFIED COPY

22.

Defendant **GOM Shelf LLC** is a Delaware limited liability company with its principal business office at 2107 Research Forest Drive, Suite 250, The Woodlands, Texas 77380. It is registered to do business in Louisiana and may be served through its registered agent, Capitol Corporate Services, Inc., 8550 United Plaza Building II, Suite 305, Baton Rouge, Louisiana 70809.

23.

Defendant **Commodore Offshore Operating, LLC** is a Delaware limited liability company with its principal business office at 2103 Research Forest Drive, Suite 225, The Woodlands, Texas 77380. It is registered to do business in Louisiana and may be served through its registered agent, C T Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

24.

Defendant **Island Operating Company, Inc.** is a Louisiana corporation domiciled at 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809. It may be served through its registered agent, C T Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

25.

Defendant **Talos ERT LLC** is a Delaware limited liability company with its principal business office at 333 Clay Street, Suite 3300, Houston, Texas 77002. It is registered to do business in Louisiana and may be served through its registered agent, C T Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

26.

Defendant **Sea Robin Pipeline Company, LLC** is a Delaware limited liability company with its principal business office at 8111 Westchester Drive, Suite 600, Dallas, Texas 75225. It is registered to do business in Louisiana and may be served through its registered agent, Corporation Service Company, 450 Laurel Street, 8th Floor, Baton Rouge, Louisiana 70801.

27.

Defendant **Enterprise Gas Processing, LLC** is a Delaware limited liability company with its principal business office at 1100 Louisiana Street, Houston, Texas 77002. It is registered to do



NON-CERTIFIED COPY

business in Louisiana and may be served through its registered agent, C T Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

28.

Defendant **Energy Transfer LP** is a Delaware limited partnership with its principal business office at 8111 Westchester Drive, Suite 600, Dallas, Texas 75225. It is not registered to do business in Louisiana and may be served under the Louisiana Long-Arm Statute, La. R.S. 13:3204, at its principal business office.

29.

This Court has subject-matter jurisdiction over this civil action for damages under Louisiana law. La. Const. art. V, § 16(A).

30.

This Court has personal jurisdiction over Island, which is domiciled in Louisiana, and over GOM Shelf and Commodore, which are registered to do business in Louisiana, operated the Facility in Vermilion Parish, and caused injury in Louisiana through their acts and omissions here. This Court also has personal jurisdiction over Talos, which is registered to do business in Louisiana and owns and operates the Facility in Vermilion Parish. This Court also has personal jurisdiction over Sea Robin Pipeline and Enterprise, which are registered to do business in Louisiana, and over Energy Transfer, which owns and operates Sea Robin Pipeline's system, because their acts and omissions alleged in this Petition caused injury in Louisiana. La. R.S. 13:3201.

31.

Venue is proper in Vermilion Parish under La. C.C.P. art. 74 because the conduct that caused Plaintiffs' injuries occurred in Vermilion Parish and Plaintiffs sustained their damages there.

32.

This action arises from the operation of an onshore facility in Vermilion Parish and the release of hazardous substances from that facility onto neighboring homes and land in Vermilion Parish. Plaintiffs assert claims only under Louisiana law.



NON-CERTIFIED COPY

33.

Plaintiffs' claims are properly cumulated under La. C.C.P. art. 463. They arise from the same release and share a community of interest, each is within this Court's jurisdiction and venue, and all are mutually consistent and use the same form of procedure.

34.

This case arises from an industrial release of toxic chemicals that should never have happened and that sickened neighboring children and adults, forced families from their homes, and hastened one man's death.

35.

On October 13, 2024, a natural-gas facility near Erath released natural gas, condensate, and other hydrocarbons into the surrounding community. The release crossed the Facility's boundaries, coating neighboring land and moving toward the homes where Plaintiffs and their children lived. The Facility Defendants could not quantify how much was released. The incident was serious enough to shut down the Facility, bring three fire departments to the scene, and leave condensate on neighboring property.

36.

The release was the result of known and unrepaired defects. After an investigation, the Louisiana Department of Environmental Quality ("LDEQ") determined that Facility operators had known for more than a year that a throttle-valve controller was not functioning properly in automatic mode but had failed to repair it. When operators instead ran the controller manually with the throttle valve fully open, it could not manage the incoming surge of product. The Facility's own representative told LDEQ that, had the controller been operating in automatic mode, "[t]he release would not have occurred." Other safety equipment also failed that day.

37.

The Plaintiffs in this action are adults and children who lived near the Facility. They suffered serious physical injuries after the release, including respiratory, gastrointestinal, neurological, cardiovascular, and other illnesses. Some required hospitalization or surgery. Some lost employment or were forced from their homes. One child developed seizures requiring



NON-CERTIFIED COPY

continuing neurological care. Plaintiffs' exposure to the substances released from the Facility caused these injuries or aggravated conditions they already had.

38.

Plaintiffs bring this action under Louisiana law for negligence, for damage caused by defective things in the Facility Defendants' custody, for violation of the obligations of neighborhood under La. C.C. arts. 667–669, and for the Facility Defendants' failure to warn and protect their neighbors after the release. They seek the damages Louisiana law allows and a trial by jury.

## FACTUAL ALLEGATIONS

### A. The Sea Robin Facility

39.

The Sea Robin Condensate Removal Facility (the "Facility") is an onshore industrial plant at 5533 Aristide Road near Erath, in Vermilion Parish, Louisiana. It has operated at that site since about 1970.

40.

The Facility receives a pressurized stream of natural gas and liquid hydrocarbons by pipeline. It separates the liquid, known as natural gas condensate, from the gas, compresses the gas and sends it on for processing, and stores the condensate in tanks before shipping it out.

41.

Natural gas condensate is a volatile, flammable petroleum liquid. The Facility's air permit lists benzene, toluene, xylene, n-hexane, and formaldehyde among the toxic air pollutants its operations emit. Benzene is a known human carcinogen.

42.

The Facility sits among pastures and homes. Aristide Road runs along its northern boundary, with pasture and homes across the road. Families live along Aristide Road, Louisiana Highway 331, and Henry M. Perrin Road near the Facility. Plaintiffs are among them.

43.

At all relevant times, GOM Shelf LLC ("GOM Shelf") owned the Facility. GOM Shelf acquired the Facility effective August 27, 2021, and until April 1, 2026, it held the Facility's air



NON-CERTIFIED COPY

and water permits and was the Facility's owner and operator of record with the Louisiana Department of Environmental Quality ("LDEQ"). After the release described below, GOM Shelf told LDEQ that "GOM Shelf, LLC is the RP," or responsible party, "for the incident."

44.

At all relevant times, Commodore Offshore Operating, LLC ("Commodore") operated the Facility for GOM Shelf. Three days after the release, the owner of a pipeline that crosses the Facility notified LDEQ in writing that the Facility "is operated by Commodore Offshore Operating, LLC" and that Commodore was the responsible party for the release. The interstate pipeline that delivers flow to the Facility likewise publicly described it as the "Condensate Removal Facility, operated by Commodore Offshore Operating, LLC."

45.

Commodore's personnel managed the Facility's regulatory compliance and its response to the release. Jeremy Dugas, on information and belief a Commodore employee, was the Facility's environmental contact with LDEQ, signed GOM Shelf's written report of the release, and gave LDEQ the company's account of its cause. John Seeger, signing as "CEO" with a Commodore email address, signed as the responsible official for the Facility's wastewater permit.

46.

At all relevant times, Island Operating Company, Inc. ("Island") supplied the operators who ran the Facility day to day. Under a master services agreement with GOM Shelf effective August 3, 2022, Island agreed to furnish "all supervisory personnel, labor, equipment, machinery, transportation, tools, materials, and supplies necessary to perform the Work," to perform its services "in a safe, good, timely, and skillful manner," and to perform its work "in accordance with the most stringent of safety regulations, precautions, and procedures." Island employees, including Lonnie Blanchard and Roger Luquette, worked as operators at the Facility in October 2024.

47.

GOM Shelf, Commodore, and Island (together, the "Facility Defendants") each operated, inspected, and maintained the Facility's process equipment and safety systems, and each acted through employees working in the course and scope of their employment.



NON-CERTIFIED COPY

48.

Effective April 1, 2026, GOM Shelf transferred ownership and operation of the Facility, including its air and water permits, to Talos ERT LLC ("Talos"). LDEQ approved the transfer of the Facility's permits from GOM Shelf to Talos on July 10, 2026.

49.

On information and belief, as part of that transaction Talos assumed the liabilities of GOM Shelf arising from GOM Shelf's ownership and operation of the Facility, including liabilities arising from the October 13, 2024 release.

**B. The October 13, 2024 Release**

50.

On October 13, 2024, the Facility Defendants negligently caused natural gas, natural gas condensate, and other hydrocarbons to be released from the Facility into the air.

51.

LDEQ records state that the release was discovered at about 9:35 a.m. GOM Shelf's consultants later wrote that a pressure safety valve at the Facility "engaged, resulting in a mist of condensate and natural gas entering the bordering properties," and that after "[f]acility personnel shut in the facility," pressure bled to the flare, which "misted condensate and natural gas to the neighboring property until the pressure from the system was released."

52.

According to LDEQ's records, the ground beneath the flare caught fire, and the Henry, Abbeville, and Erath fire departments responded. LDEQ recorded a south-southwest wind of about ten miles per hour, and responders detected volatile organic compounds near the compressor. GOM Shelf reported that natural gas and liquids were "routed to the burning control flare, resulting in the opacity limit being exceeded," and later told LDEQ that the volume released was "unable to be quantified due to nature of release."

53.

LDEQ records show that Vermilion Parish 911 reported the incident to LDEQ at 10:58 a.m. and that GOM Shelf's contractor notified the state hazardous materials hotline at about 11:34 a.m.


NON-CERTIFIED COPY

54.

The wind carried the released gas and condensate beyond the Facility's boundaries, across the neighboring pasture and Aristide Road, and toward the homes where Plaintiffs lived.

55.

The released condensate settled on the land, roads, and property surrounding the Facility. The release also sent smoke from the Facility's flare into the surrounding air.




Figures 1–2. Flaring at the Sea Robin facility.

56.

The release shut the Facility down. On October 14, 2024, the pipeline company that delivers flow to the Facility gave notice that producers on its system were shut in "due to high liquid levels at the Condensate Removal Facility."

57.

The release originated at two locations at opposite ends of the facility: a Northern Release Point and a Southern Release Point. GOM Shelf's consultants later mapped approximately 6.47 acres of neighboring land affected by the release, extending north of the Facility on both sides of Aristide Road, east of the Facility, and southeast of it.



NON-CERTIFIED COPY




| Soil Boring | LAT | LONG |
|---|---|---|
| 1 | 29.898723 | -92.064327 |
| 2 | 29.898714 | -92.063806 |
| 3 | 29.898318 | -92.064333 |
| 4 | 29.898307 | -92.063815 |
| 5 | 29.897887 | -92.06433 |
| 6 | 29.897866 | -92.063827 |
| 7 | 29.897237 | -92.06447 |
| 8 | 29.897246 | -92.064083 |
| 9 | 29.89688 | -92.064467 |
| 10 | 29.896883 | -92.064283 |
| 11 | 29.896529 | -92.06447 |
| 12 | 29.895858 | -92.064411 |
| 13 | 29.895372 | -92.064257 |
| 14 | 29.895365 | -92.063914 |
| 15 | 29.894979 | -92.064257 |
| 16 | 29.894972 | -92.063911 |
| 17 | 29.894598 | -92.064261 |
| 18 | 29.894594 | -92.063907 |
| 19 | 29.894164 | -92.064163 |
| 20 | 29.893695 | -92.064042 |
| 21 | 29.893367 | -92.064339 |
| 22 | 29.895135 | -92.064514 |
| 23 | 29.894321 | -92.064524 |
| 24 | 29.893498 | -92.064543 |
| 25 | 29.893632 | -92.06482 |
| 26 | 29.893383 | -92.06482 |

| Impacted Area | Desc. | Approx. Acreage |
|---|---|---|
| 1 | Impacted Northern | 3.42 |
| 2 | Impacted Eastern | 2.45 |
| 3 | Impacted Southeastern | 0.6 |

| Release Point | LAT | LONG |
|---|---|---|
| North | 29.896534 | -92.065041 |
| South | 29.893572 | -92.06508 |

Figure 3. Site map showing the northern and southern release points.
Source: Incident Sampling Report, Appendix A.



NON-CERTIFIED COPY

EXHIBIT A-1

C. **The Reported Cause of the Release**

58.

After an investigation, LDEQ concluded that the release was caused by a throttle valve controller that Facility operators had known for more than a year was not working properly, and that they had failed to repair.

59.

On June 3, 2025, LDEQ referred the release to its Enforcement Division for a potential violation of LAC 33:III.905.A, which requires that air pollution control facilities be "used and diligently maintained in proper working order." In the referral, LDEQ wrote:

> The cause of the release was determined to be the pipeline throttle valve control being in the wrong operation mode. Operators failed to communicate that the throttle valve controller was not functioning properly in automatic mode. The throttle valve controller was then operated in manual mode which is not able to manage the volume influx of the product with the throttle valve set at the 100% open position (found in attachment 3). Operators had been aware that the throttle valve controller was not functioning properly for over a year but failed to repair it since the facility was receiving little to low fluids for the previous 10 months (found in attachment 3).

60.

According to LDEQ's notes of its investigator's May 13, 2025 telephone call with Mr. Dugas, when asked whether operating the throttle valve controller in automatic mode would have prevented the release Mr. Dugas answered: "The release would not have occurred. The Operators were aware that the Throttle Valve Control's auto mode had not worked for about a year. The valve had not been fixed because the facility had not been receiving fluids."

61.

In an April 21, 2025 email to LDEQ, more than six months after the release, Mr. Dugas explained that other safety equipment had also failed on the day of the release: a scrubber blow-down valve stem "was found to be broken in half," a shutdown valve relay "did not drop out," and a high-level safety switch "was not operating correctly."

62.

In the same email, Mr. Dugas stated that the Facility's operators "failed to communicate after October 10th, that the throttle valve controller wasn't functioning properly in an automatic



NON-CERTIFIED COPY

mode and operated in manual mode which could not manage the volume influx of product with the throttle valve set at 100% open position."

63.

Mr. Dugas's email also stated that, beginning October 10, 2024, the Facility shut down incoming flow from the pipeline daily; that "[t]he interruptions in flow caused product to stack in the incoming pipeline before the [Facility]"; and that "[w]hen flow resumed, high product volume would surge the [Facility]."

64.

Among its corrective actions, the email committed to "[c]onduct competency assessments on personnel working at SRCRF in effort of identifying potential gaps of skills and knowledge specific to Facility operations as well as understanding the potential risk associated with equipment that may be faulty."

65.

GOM Shelf's written report of the release to LDEQ stated that "[n]egotiations are underway with adjacent land owners on remedial actions."

66.

On August 24, 2026, LDEQ issued Warning Letter AE-L-26-00462 to GOM Shelf, stating that the investigation report, "noting areas of concern," had been forwarded to LDEQ's Enforcement Division.

67.

LDEQ records and the Facility's own operating procedures describe the hazard that liquid surges pose to the Facility. Liquid can collect in low points of the incoming pipeline and reach the Facility in large surges, called slugs. The Facility routes incoming flow through two large vessels, called slug catchers, and a throttle valve on the incoming pipeline regulates how fast flow enters the plant. According to the operating procedures, in automatic mode a controller adjusts the throttle valve as liquid levels change.



NON-CERTIFIED COPY

68.

The operating procedures direct operators to "ensure the Inlet Throttle System is in the automatic mode." They warn that excess liquid in the slug catchers causes "Carryover to flare" and that a malfunctioning level control on the separators causes "Carryover to vent."

69.

LDEQ records reflect earlier releases and upsets caused by liquid at the Facility. In December 1994, according to the operator's report to LDEQ, a malfunctioning level control let liquid carry over into a compressor's suction line, and condensate escaped the Facility and traveled about a mile off site. In 1998, 1999, and 2000, the Facility's then-owner reported to LDEQ that unexpected surges of liquid had overwhelmed the plant and caused smoking flare episodes. It attributed the incidents to "inadequate process flare capacity" and reported that during one upset "the rate of liquids received by the facility was more than 3 times the design capacity of the flare."

70.

In the housekeeping plan filed for the Facility's air permit, the Facility's operator committed to "[m]aintain pressure relief valves in normal operational condition," to "[m]aintain pneumatic controllers in proper working condition," and to "[p]romptly locate the source of a pressure relief valve release."

71.

The job safety analysis for the Facility's daily production rounds dated October 13, 2024 lists a single person, Island operator Lonnie Blanchard, as both the person in charge and the ultimate work authority. It required the operator to "[c]onfirm safety devices are in the 'in service' position or status" and to "[i]nitiate immediately corrective action of unmonitored safety devices."

**D. The Pipeline and the Gas Plant**

72.

Sea Robin Pipeline Company, LLC ("Sea Robin Pipeline") owns and operates the pipeline that delivers natural gas and liquid hydrocarbons into the Facility. Sea Robin Pipeline schedules the volume of gas that moves through the pipeline and into the Facility.



NON-CERTIFIED COPY

EXHIBIT A-1

73.

Sea Robin Pipeline is a wholly owned subsidiary of Energy Transfer LP ("Energy Transfer"). Energy Transfer tells investors that it "directly own[s] and operate[s]" its interstate natural gas pipelines, and it lists the Sea Robin pipeline among them. The only managers of Sea Robin Pipeline listed with the Louisiana Secretary of State are Thomas Long and Marshall McCrea, who are Energy Transfer's co-chief executive officers. Sea Robin Pipeline's operating notices, including the notices described below, are published on Energy Transfer's website.

74.

After the Facility removes condensate, the gas continues to the Sea Robin Gas Processing Plant (the "Gas Plant"), a separate plant near Erath in Vermilion Parish. Enterprise Gas Processing, LLC ("Enterprise") operates the Gas Plant. In 2024, the Gas Plant dehydrated gas carried by the pipeline, removing water so that the gas could be delivered to downstream parties.

75.

Sea Robin Pipeline, Enterprise, and Energy Transfer are referred to together as the "Pipeline and Plant Defendants."

76.

On October 8, 2024, the operator of the Gas Plant told Sea Robin Pipeline that it would dehydrate gas only between 7 a.m. and 4 p.m. each day, and possibly not at all on weekends.

77.

On October 10, 2024, Sea Robin Pipeline gave public notice of "operational constraints" on that part of its system and announced that deliveries would be "scheduled to the level of actual flow." Sea Robin Pipeline later stated that it was adjusting flows "[t]o guard against the potential for the Sea Robin West system to exceed its maximum allowable operating pressure."

78.

Beginning October 10, 2024, the Facility shut down incoming flow from the pipeline each day outside the hours the Gas Plant would dehydrate gas. Gas and liquid continued to enter the pipeline upstream of the Facility while the Facility's inlet was closed. Product accumulated, or stacked, in the pipeline ahead of the Facility, and surged into the Facility each time flow resumed. The release occurred three days later, on Sunday, October 13, 2024.



NON-CERTIFIED COPY

79.

The Pipeline and Plant Defendants knew or should have known that gas and liquid would continue to enter the pipeline while the Facility's inlet was closed, that the product would accumulate in the pipeline, and that it would surge into the Facility when flow resumed.

80.

None of the Pipeline and Plant Defendants stopped gas and liquid from entering the pipeline during the hours the Facility could not receive it, and none coordinated with the Facility's operators to prevent the resulting surges.

81.

After the release, Mr. Dugas attributed the surges in part to the Pipeline and Plant Defendants. In his April 21, 2025 email to LDEQ, he wrote that the excess liquid was "believed to be caused by the operational time restrictions (daylight hours – Monday to Friday) placed on the Facility by the downstream Sea Robin Plant." He identified as a contributing factor "Enterprise's new hours of operation at the Sea Robin Plant in effect on October 10, 2024."

82.

Mr. Dugas also told LDEQ that Sea Robin Pipeline, Enterprise, and Energy Transfer did not direct that the flow of gas into the pipeline be stopped, which would have reduced the volume of product accumulating in the pipeline. Among his corrective actions, he wrote that "Sea Robin should ensure all disruptions to planned operational processes need to be communicated to all affected parties," and that if "Sea Robin operates the gas pipeline on a curtailed operating schedule as in the past," the Facility would add operators to return it to production.

83.

The surges Mr. Dugas described do not excuse the Facility Defendants' failures. Handling surges of liquid was part of the Facility's ordinary operation, and the throttle valve controller existed to regulate the flow of product into the Facility. The Facility Defendants knew for about a year that the controller did not work in automatic mode.



NON-CERTIFIED COPY

**E. The Facility Defendants' Failure to Warn or Protect Their Neighbors**

84.

The Facility Defendants knew on October 13, 2024 that the release had left the Facility. Their personnel were on site with fire departments and state responders while condensate sheen covered the neighboring pasture and road.

85.

The Facility Defendants knew how to alert the community. After the 1994 release, the Facility's operator notified neighboring landowners and the parish emergency planning office the same day.

86.

Louisiana maintains systems for warning the public of a hazardous release. The Integrated Public Alert and Warning System pushes Wireless Emergency Alerts directly to mobile telephones and broadcasts over the Emergency Alert System. NOAA All-Hazards Weather Radio broadcasts non-weather emergency messages, including a Hazardous Materials Warning code for a toxic plume and a Shelter in Place Warning code. None of these was used to warn the families living beside the Facility.

87.

This time, the Facility Defendants did not warn the families living near the Facility. They did not tell residents what had been released, whether to stay indoors or leave, whether to avoid contaminated surfaces, or whether to seek medical evaluation. They did not tell them, then or later, whether their homes and yards were safe.

88.

GOM Shelf's written report to LDEQ, dated October 17, 2024, described "minimal visual offsite impact" and did not mention the neighboring homes or the people who lived in them.

89.

The Facility Defendants' response focused on the Facility and the neighboring pasture. Their contractor cleaned the Facility, and GOM Shelf cut and removed contaminated grass from the pasture east of the Facility.



NON-CERTIFIED COPY

90.

Some cattle owners noticed the release on their own and moved their herds off the affected pastures. Others were never told. The herd belonging to Emile Thibodeaux grazed roughly one hundred yards north of the Facility. No one notified him, his cattle were never moved, and they continued to graze on contaminated grass.

91.

GOM Shelf's consultants did not begin sampling until November 21, 2024, thirty-nine days after the release. They sampled only surface soil. They did not sample outdoor or indoor air, dust or surfaces inside any home, or drinking water, and no one evaluated any resident.

92.

Even that limited sampling found petroleum hydrocarbons and thallium in soil on neighboring land above the screening levels used for non-industrial property. The consultants' report acknowledged that "offsite populations may be exposed." Yet the regulatory form submitted with the report answered "No" to whether there was offsite contamination and classified the land use as industrial.

93.

Because the Facility Defendants gave no warning, Plaintiffs did not know they had been exposed to hazardous substances or that they should take steps to protect themselves, and they continued living in the affected area.

**F. Harm to Plaintiffs**

94.

Plaintiffs suffered exposure near the Facility during the release or through later contact with the residue it left behind.

95.

*The Guidry family.* Plaintiff Samantha Hudnall Guidry lived with her children, Plaintiffs Josiah Guidry, Jaylah Guidry, and Jaxton Guidry, in a home on Aristide Road across the road from the north end of the Facility, within the area downwind of the compressor where the release began. The Guidrys were at home on October 13, 2024. Smoke from the release reached their home, and soot settled on the siding and on their garden plants.



NON-CERTIFIED COPY

96.

No one from the Facility told the Guidrys what had been released, whether it was safe to stay in their home, or whether they should seek medical care.

97.

Josiah Guidry developed high blood pressure and respiratory symptoms within weeks of the release and was hospitalized. He has since been diagnosed with chronic kidney disease and hypertension, which require continuing treatment. He also suffers headaches, fatigue, weakness, anxiety, and depression.

98.

Jaylah Guidry has suffered worsened respiratory disease, gastrointestinal illness requiring emergency treatment, headaches, visual disturbance, and gynecological injuries.

99.

Jaxton Guidry has suffered recurrent respiratory and gastrointestinal illness, nosebleeds, and abnormalities in his blood counts.

100.

Samantha Hudnall Guidry has suffered pulmonary symptoms, fatigue, and impaired concentration and memory. Those injuries affected her work, and she lost her job in early 2025.

101.

Plaintiffs Kyle Hudnall and Lyle Hudnall are Samantha Guidry's brothers. Beginning on or around April 5, 2025, they stayed at the Guidry home on Aristide Road, across the road from the Facility, to help their sister with repairs and upkeep to the property. They pressure-washed the house and its surroundings and worked outdoors on the property over a period of days, and in doing so they came into direct contact with condensate and residue that the release had left behind.

102.

Kyle Hudnall has suffered gastrointestinal and respiratory symptoms, headaches, unexplained fevers, joint and muscle swelling, weakness, numbness and tingling in his extremities, otolaryngologic symptoms, seizures, fatigue, reduced concentration and memory, and depression.



NON-CERTIFIED COPY

103.

Lyle Hudnall has suffered respiratory and gastrointestinal symptoms, otolaryngologic symptoms, chronic and severe headaches, muscle, joint, and bone pain and weakness, muscle spasms, excessive sweating, light sensitivity, sleep disturbance, and increased fatigue.

104.

On or around November 29, 2025, the Guidrys, including Kyle and Lyle Hudnall, left the home to avoid further exposure, splitting the family into separate households.

105.

*The Bowen family.* Plaintiffs Matthew Bowen and Jana Toups Bowen lived with their son, Plaintiff Thomas Bowen, in a home on Louisiana Highway 331 near the Facility. Mr. and Mrs. Bowen owned the home and the land on which it sits on October 13, 2024, and they own it still.

106.

Matthew Bowen, who was outdoors in the affected area on October 13, 2024, has suffered headaches, fever, cough, and respiratory and sinus symptoms.

107.

Thomas Bowen developed persistent respiratory symptoms, recurrent ear infections, enlarged tonsils, hearing difficulty, and disordered breathing during sleep, and he required surgery in May 2025.

108.

Jana Toups Bowen has suffered respiratory and sinus symptoms, skin and eye irritation, fatigue, sleep disturbance, headaches, anxiety, and depression. In November 2025, she suffered a miscarriage.

109.

*The Mann family.* Plaintiffs Andrew Darrel Mann and Jardin Mann rented a home on Henry M. Perrin Road near the Facility, where they lived with their children, Plaintiffs Beaux Mann, Greyson Mann, and Scarlett Mann.

110.

Andrew Darrel Mann has suffered recurrent respiratory illness requiring breathing treatments, sinus disease, migraines, nosebleeds, gastrointestinal illness, skin irritation, profound



NON-CERTIFIED COPY

fatigue, and interrupted breathing during sleep, and he has required emergency treatment. He lost his job in July 2025 because of his illness and his family's medical needs.

111.

Jardin Mann was hospitalized in November 2024 for severe anemia and abnormal cardiac findings.

112.

Beaux Mann has suffered recurrent respiratory and gastrointestinal illness, weakness, headaches, nosebleeds, and anemia, has required emergency treatment, and has missed substantial schooling.

113.

Greyson Mann began having seizures in March 2025 and has been diagnosed with a seizure disorder that requires continuing neurological care.

114.

Scarlett Mann has suffered recurrent gastrointestinal illness, rashes, congestion, and fatigue.

115.

Each member of the Mann family has suffered persistent fatigue. Mr. Mann has difficulty breathing at night and exhaustion severe enough that he cannot remain alert through the day.

116.

*The Fish household.* Plaintiffs Nichalos David Fish, Torie Lynn Fish, and Ahlia Ray Trahan lived in a home on Louisiana Highway 331 near the Facility. The home and the land on which it sits were owned on October 13, 2024, and are owned still, by Torie Lynn Fish.

117.

Nichalos David Fish has suffered worsened respiratory symptoms, gastrointestinal symptoms, fatigue, numbness and tingling in his extremities, impaired grip and dexterity, and cognitive symptoms.



NON-CERTIFIED COPY

EXHIBIT A-1

118.

Torie Lynn Fish has suffered respiratory, gastrointestinal, neurological, and joint symptoms, weakness, and abnormal liver function and blood cell findings. She has further suffered from anxiety and depression.

119.

Ahlia Ray Trahan has suffered headaches, dizziness, blurred vision, fatigue, sleep disturbance, respiratory and gastrointestinal symptoms, rashes, bruising, numbness, reduced concentration and memory, anxiety, and joint and muscle pain.

120.

*The Belaire family.* Plaintiff Janis Belaire lived with her husband, Allen Dale Belaire, in a home on Louisiana Highway 331 near the Facility. Mr. Belaire had a pre-existing malignancy. Within days after the release, he developed jaundice and severe weakness requiring hospitalization, followed by physical and cognitive decline. He died on October 28, 2025. The exposure aggravated his disease and hastened his decline and death. Mrs. Belaire has suffered her own exposure-related injuries, including pancreatic and gastrointestinal disease, and the loss of her husband. Mrs. Belaire owned the home and the land on which it sits on October 13, 2024, and she owns it still.

121.

*The Comeaux household.* Plaintiffs Jennifer Comeaux and her minor sons, Plaintiffs Bentley Comeaux and Kiptyn Comeaux, lived in a home on Louisiana Highway 331 near the Facility. On the day of the release, Mrs. Comeaux went outside and found yellow, oily droplets, dark in the center, covering the grass, the outdoor furniture, her children's trampoline, the vehicles, the house, and the surface of the swimming pool. Everything had to be washed. No one told her what the droplets were or where they had come from. Mrs. Comeaux does not own the home or the land on which it sits. That property is owned by Plaintiff Janis Belaire and by Elliot James Belaire, and Mrs. Comeaux and her sons live there rent-free.



NON-CERTIFIED COPY

122.

Jennifer Comeaux has suffered respiratory and sinus disease, skin disorders including widespread pinpoint lesions and eczema, joint and muscle pain, headaches, fatigue, menstrual disturbance, thyroid disease, and impaired concentration and memory.

123.

Bentley Comeaux, who was fourteen at the time of the release, has suffered a marked decline in cognition and behavior. He developed severe anxiety and difficulty concentrating, his memory and schoolwork deteriorated, his grades fell from A's, B's, and C's to D's and F's, and he failed a year of school. He also suffers nasal bleeding, dry eyes, joint and muscle pain, and excessive sweating.

124.

Kiptyn Comeaux, who was eleven at the time of the release, has suffered recurrent respiratory illness including pneumonia and bronchitis, chronic sinus disease, migraines with vomiting, leg pain, fatigue, and a decline in his schoolwork. He has also been diagnosed with a chest-wall deformity for which he has been referred for surgery.

125.

*The Domingues household.* Plaintiffs Corbet J. Domingues, Jr. and Charlotte Domingues lived in their home on Aurelien Road near the Facility. Mr. Domingues went to the area after the release and helped move cattle off the affected land. Mr. and Mrs. Domingues owned the home and the land on which it sits on October 13, 2024, and they own it still.

126.

Corbet J. Domingues, Jr. has suffered respiratory symptoms, shortness of breath, skin disorders including rashes and discoloration, otolaryngologic symptoms, urologic symptoms, and increased fatigue.

127.

Charlotte Domingues has suffered recurrent skin infections and abscesses, allergy-like symptoms, and headaches.



NON-CERTIFIED COPY

128.

*Anastasie Domingues.* Plaintiff Anastasie P. Domingues has lived in her home on Louisiana Highway 331, near the Facility, since 1969. She was outdoors on her property regularly both before and after the release. She has suffered worsened respiratory disease requiring supplemental oxygen, shortness of breath, fatigue, weakness, and a loss of her ability to perform ordinary daily activities without assistance. Mrs. Domingues owned the home and the land on which it sits on October 13, 2024, and she owns it still.

129.

*The Norris household.* Plaintiffs Jonathan Norris and Jennifer Domingues Norris lived with their minor son, Plaintiff Chase Norris, in a home on Louisiana Highway 331 near the Facility, next door to Mrs. Norris's mother, Plaintiff Anastasie Domingues. Mr. and Mrs. Norris owned the home and the land on which it sits on October 13, 2024, and they own it still.

130.

Jennifer Domingues Norris developed skin lesions and areas of abnormal pigmentation that she did not have before the release, and she has suffered recurrent upper respiratory and sinus infections.

131.

Jonathan Norris has suffered hypertension and biliary disease since the release.

132.

Chase Norris had asthma and environmental allergies before the release, and both have grown worse since. He has suffered recurrent upper respiratory symptoms requiring continuing care.

133.

*Joyce Lane.* Plaintiff Joyce K. Lane has lived in her home on Louisiana Highway 331, near the Facility, since 2006. She has suffered worsened respiratory disease, cardiac symptoms, urologic symptoms, otolaryngologic symptoms, joint and muscle pain, fatigue, and sleep disturbance. Ms. Lane owned her home on October 13, 2024, and she owns it still. She does not own the land on which it sits; that land is owned by Plaintiff Janis Belaire and by Elliot James



NON-CERTIFIED COPY

Belaire. Since the release, the interior walls of her home have begun to crumble, and black debris falls onto her floors.

134.

Plaintiffs were exposed to the substances released from the Facility by breathing the airborne condensate, gas, and smoke, by contact with condensate and soot deposited around their homes, and by continuing to live in the affected area without any warning. Post-exposure laboratory testing of certain Plaintiffs showed metals and other abnormalities consistent with that exposure. Pets that had been outdoors during the release were brought back inside, and in some cases slept in the same beds as members of the household, carrying condensate and residue indoors with them.

135.

The exposure caused each Plaintiff's injuries described above or aggravated conditions the Plaintiff already had.

136.

The release also damaged the property of the Plaintiffs who owned their homes. Condensate, soot, and other residue from the release settled on their houses, outbuildings, vehicles, yards, gardens, and belongings, and on the land around them. Vegetation on the affected properties sickened and died. Those Plaintiffs have incurred, and will incur, the reasonable costs of cleaning, repairing, and restoring their property and of replacing items that cannot reasonably be cleaned or repaired. Their property has also lost value, including any loss in value that remains after the property is restored.

137.

The Guidry and Mann families rented the homes in which they lived, Kyle and Lyle Hudnall stayed at the Guidry home without owning it, and Mrs. Comeaux and her sons live in their home rent-free. While they do not assert a claim for damage to the buildings or the land, they do assert claims for damage to the movable property they owned, for the loss of the use and enjoyment of their homes, and for the expense of relocating.



NON-CERTIFIED COPY

138.

Each Plaintiff has suffered physical pain, mental anguish, and emotional distress, including, for the parents, distress over their children's illnesses. Plaintiffs reasonably fear developing cancer and other latent disease, and they require continuing medical treatment and medical monitoring related to their injuries. Plaintiffs have also lost the use and enjoyment of their homes, and some have incurred relocation expenses and lost income.

## CAUSES OF ACTION

### COUNT I — NEGLIGENCE

(La. C.C. arts. 2315, 2316, and 2320)
*Against the Facility Defendants*

139.

Plaintiffs reallege the preceding paragraphs.

140.

Each Facility Defendant owed Plaintiffs a duty to exercise reasonable care in operating, inspecting, maintaining, and repairing the Facility and its equipment, and in training, supervising, and staffing the Facility's workforce, so that hazardous substances would not be released from the Facility onto neighboring property and the people who live there.

141.

Each Facility Defendant breached that duty.

142.

Each Facility Defendant is liable for its own negligence and, under La. C.C. art. 2320, for the negligence of its employees acting in the course and scope of their employment.

143.

The Facility Defendants' negligence caused the October 13, 2024 release and Plaintiffs' resulting exposure, injuries, and damages. Those injuries and damages are within the scope of the duties the Facility Defendants breached.


NON-CERTIFIED COPY

**COUNT II — DAMAGE CAUSED BY DEFECTIVE THINGS**

**IN DEFENDANTS' CUSTODY**

(La. C.C. arts. 2317 and 2317.1)
*Against GOM Shelf, Commodore, and Island Operating Company, Inc.*

144.

Plaintiffs reallege the preceding paragraphs.

145.

GOM Shelf, Commodore, and Island had custody, or garde, of the Facility and its equipment.

146.

The Facility and its equipment had a vice or defect that created an unreasonable risk of harm to persons and property near the Facility.

147.

GOM Shelf, Commodore, and Island knew or, in the exercise of reasonable care, should have known of that vice or defect.

148.

The damage could have been prevented by the exercise of reasonable care, and GOM Shelf, Commodore, and Island failed to exercise such reasonable care.

149.

The vice or defect caused the October 13, 2024 release and Plaintiffs' resulting exposure, injuries, and damages.

**COUNT III — OBLIGATIONS OF NEIGHBORHOOD**

(La. C.C. arts. 667, 668, and 669)
*Against GOM Shelf and Commodore*

150.

Plaintiffs reallege the preceding paragraphs.

151.

GOM Shelf was the proprietor of the Facility, and Commodore exercised control over the Facility's operations. Plaintiffs are their neighbors.



NON-CERTIFIED COPY

152.

GOM Shelf's and Commodore's works and activities on the Facility caused damage to Plaintiffs and deprived them of the enjoyment of their property.

153.

GOM Shelf and Commodore knew or, in the exercise of reasonable care, should have known that their works and activities would cause that damage. The damage could have been prevented by the exercise of reasonable care, and they failed to exercise such reasonable care.

154.

The release subjected Plaintiffs to inconvenience beyond what neighbors must tolerate under La. C.C. art. 669.

**COUNT IV — NEGLIGENT FAILURE TO WARN AND PROTECT**

(La. C.C. arts. 2315, 2316, and 2320)
*Against the Facility Defendants*

155.

Plaintiffs reallege the preceding paragraphs.

156.

This claim is separate from and in addition to the Facility Defendants' liability for causing the release.

157.

Once the Facility Defendants knew or should have known that substances released from the Facility had reached neighboring property, each Facility Defendant owed the people living there a duty to exercise reasonable care to warn them and to protect them from further harm.

158.

Each Facility Defendant breached that duty, including by failing to warn Plaintiffs of the release, the substances released, and the precautions they should take.

159.

Those breaches caused Plaintiffs injuries and damages in addition to those caused by the release itself.



NON-CERTIFIED COPY

**COUNT V — NEGLIGENCE**

(La. C.C. arts. 2315, 2316, and 2320)
*Against the Pipeline and Plant Defendants*

160.

Plaintiffs reallege the preceding paragraphs.

161.

Each Pipeline and Plant Defendant owed Plaintiffs a duty to exercise reasonable care in scheduling, restricting, and coordinating the flow of gas and liquid into and out of the Facility, so as not to create an unreasonable risk that hazardous substances would be released from the Facility onto neighboring property and the people who live there.

162.

Enterprise breached that duty, including by restricting the hours during which the Gas Plant would dehydrate gas without taking reasonable steps to stop gas and liquid from entering the pipeline during the hours the Facility could not receive it.

163.

Sea Robin Pipeline breached that duty, including by allowing gas and liquid to continue entering the pipeline during the hours the Facility could not receive it, so that product accumulated and surged into the Facility, and by failing to coordinate the new schedule with the Facility's operators.

164.

Energy Transfer, which operates the Sea Robin pipeline, breached that duty through the conduct described in the preceding paragraph.

165.

Each Pipeline and Plant Defendant is liable for its own negligence and, under La. C.C. art. 2320, for the negligence of its employees acting in the course and scope of their employment.

166.

The Pipeline and Plant Defendants' negligence combined with the Facility Defendants' negligence to cause the October 13, 2024 release and Plaintiffs' resulting exposure, injuries, and



NON-CERTIFIED COPY

damages. Those injuries and damages are within the scope of the duties the Pipeline and Plant Defendants breached.

**COUNT VI — SURVIVAL AND WRONGFUL DEATH**

(La. C.C. arts. 2315.1 and 2315.2)
*Against All Defendants*

167.

Plaintiff Janis Belaire, as the surviving spouse of Allen Dale Belaire, brings a survival action for the damages Mr. Belaire suffered before his death and a wrongful death action for her own damages from his death.

**DAMAGES**

168.

As a result of the fault alleged in this Petition, Plaintiffs are entitled to recover all damages allowed by law, including past and future physical pain and suffering; past and future mental anguish and emotional distress, including fear of future disease; past and future medical expenses, including medical monitoring directly related to their manifest injuries under La. C.C. art. 2315(B); lost wages and loss of earning capacity; loss of consortium, service, and society; loss of use and enjoyment of their homes and property; for the Plaintiffs who owned their homes, the reasonable costs of cleaning, repairing, and restoring their immovable property, the cost of replacing damaged movable property that cannot reasonably be cleaned or repaired, the diminution in the value of their property, including any loss in value remaining after restoration, and the reasonable costs of assessing and testing the property to identify and correct that damage; damage to Plaintiffs' movable property; relocation and household expenses; and legal interest from the date of judicial demand.

**JURY DEMAND**

169.

Plaintiffs are entitled to and request trial by jury on all issues so triable. Each Plaintiff's cause of action exceeds the amount required for trial by jury under La. C.C.P. art. 1732. In accordance with La. C.C.P. art. 893, Plaintiffs do not allege a specific monetary amount of damages.



NON-CERTIFIED COPY

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that:

a. Defendants **GOM Shelf LLC**, **Commodore Offshore Operating, LLC, Island Operating Company, Inc., Talos ERT LLC, Sea Robin Pipeline Company, LLC, Enterprise Gas Processing, LLC,** and **Energy Transfer LP**, be duly cited and served with a copy of this Petition and required to answer it;

b. After due proceedings, there be judgment in favor of Plaintiffs and against Defendants for all damages proven and recoverable under Louisiana law;

c. Plaintiffs be awarded legal interest from the date of judicial demand until paid, and all costs of these proceedings;

d. This matter be tried by jury; and

e. Plaintiffs be granted all other relief to which they are entitled.

**Respectfully submitted:**

**THE BEZOU LAW FIRM**

Jacques F. Bezou, Jr. (33728) jb2@bezou.com
Payton S. Lachney (39947) plachney@bezou.com
534 E. Boston Street, Covington, LA 70433
Telephone: (985) 892-2111
Facsimile: (985) 892-1413
Designated Service E-Mail: service@bezou.com

**PERRIN LANDRY deLAUNAY**

Warren A. Perrin (10498)
225 La Rue France
Lafayette, Louisiana 70508
P.O. Box 53597
Lafayette, Louisiana 70505
Telephone: (337) 233-5832
Facsimile: (337) 451-1875
Email: perrin@plddo.com
***COUNSEL FOR PLAINTIFFS***

**SERVICE INSTRUCTIONS ON NEXT PAGE**



NON-CERTIFIED COPY

**PLEASE SERVE:**

**GOM SHELF LLC**
Through its registered agent for service of process:
Capitol Corporate Services, Inc.
8550 United Plaza Building II, Suite 305
Baton Rouge, Louisiana 70809

**COMMODORE OFFSHORE OPERATING, LLC**
Through its registered agent for service of process:
C T Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

**ISLAND OPERATING COMPANY, INC.**
Through its registered agent for service of process:
C T Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

**TALOS ERT LLC**
Through its registered agent for service of process:
C T Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

**SEA ROBIN PIPELINE COMPANY, LLC**
Through its registered agent for service of process:
Corporation Service Company
450 Laurel Street, 8th Floor
Baton Rouge, Louisiana 70801

**ENTERPRISE GAS PROCESSING, LLC**
Through its registered agent for service of process:
C T Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

**ENERGY TRANSFER LP**
Through the Louisiana Long-Arm Statute, La. R.S. 13:3204, at its principal business office:
8111 Westchester Drive, Suite 600
Dallas, Texas 75225


NON-CERTIFIED COPY